| | | |
|---|---|---|
| EDWARD BRENT WILLIAMS, et al., | ) | CASE NO. 5:15-cv-2345 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| DONALD SCHISMENOS, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are two dispositive motions. Defendants City of Akron ("City") and Jesse Lesser ("Lesser") (collectively "Akron defendants") have moved for summary judgment. (Doc. No. 28 ["Akron MSJ"].) Plaintiffs oppose this motion (Doc. No. 60 ["Opp'n Akron MSJ"]), and Akron defendants have filed a reply. (Doc. No. 64 ["Akron Reply"].) Defendant Donald Schismenos ("Schismenos") also seeks summary dismissal of the claims against him. (Doc. No. 30 ["Schismenos MSJ"].) Plaintiffs oppose this motion, as well (Doc. No. 61 ["Opp'n Schismenos MSJ"]), and Schismenos has replied. (Doc. No. 65 ["Schismenos Reply"].) For the reasons to follow, the motions of Akron defendants and Schismenos for summary judgment are granted, and this case is dismissed.

## I. BACKGROUND

The unfortunate encounter between plaintiffs and members of the Akron Police Department that brings the parties to federal court today occurred more than twenty years ago. In the evening hours of October 2, 1996, plaintiff Edward Brent Williams ("Edward") received a

call from his then-girlfriend (now spouse) plaintiff Theresa M. Williams ("Theresa") (collectively "plaintiffs") that the couple's infant son, Edmund Williams ("Edmund"), was having difficulty breathing. (Doc. No. 60-1 (Affidavit of Theresa M. Williams ["T. Williams Aff."]) ¶¶ 2, 4.) The child suffered from asthma and had been seen earlier in the day by a visiting nurse, who had advised Theresa to take Edmund to the hospital if his condition worsened. (*Id*. ¶¶ 2, 3; *see also* Doc. No. 28-1 (Deposition of Edward Brent Williams ["E. Williams Dep."]) at 43[1] (describing his son's asthma as "slight").)

At the time of the call, Theresa was visiting with her mother and had the "primary family car" with her. (T. Williams Aff. ¶¶ 5, 6.) Because she wanted to tend to Edmund on the trip to the hospital, Theresa asked Edward to drive. (*Id*. ¶ 6.) According to plaintiffs, this necessitated Edward driving "a car that had just gotten back from a repair shop." (*Id*.) Plaintiffs do not dispute that: Edward did not have his driver's license with him, the tags on the vehicle he was driving had expired, and the light above the license plate of his car had gone out. (E. Williams Dep. at 64, 65, 67.)

Officers Schismenos and Lesser were patrolling the area near downtown Akron when they observed the vehicle driven by Edward and on its way to Akron Children's Hospital. Much of what happened next was captured by a personal video camera owned and installed by Officer Schismenos. At this point, it is necessary to pause to address the treatment of such evidence. The Supreme Court has definitively addressed the role of video evidence on summary judgment. In *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), the Court held that

---

[1] All page number references to Edward's deposition are to the page numbers assigned by the transcribing court reporter. All other page numbers in this memorandum opinion are to the page identification number generated by the Court's electronic docketing system.

"[w]hen opposing parties tell two very different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." According to the Sixth Circuit:

> *Scott's* holding is twofold. First, *Scott* stands for the proposition that witness accounts seeking to contradict an unambiguous video recording do not create a triable issue. [*Scott*, 550 U.S.] at 380-81 . . . . Second, *Scott* reaffirmed the holdings of *Matsushita* [*v. Elec. Indus., Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)] and *Anderson* [v. *Liberty Lobby, Inc*., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)] that, in disposing of a motion for summary judgment, a court need draw only *reasonable* inferences in favor of the nonmoving party; it need not construe the record in such a manner that is wholly unsupportable—in the view of any reasonable jury—by the video recording.

*Kinlin v. Kline*, 749 F.3d 573, 576 (6th Cir. 2014) (quotation marks and further citations omitted) (emphasis in original). So while the parties present their own, often conflicting, narratives of the encounter, the Court will consider the remaining facts in a light most favorable to plaintiffs, while keeping in mind that it will not credit any disputed facts that clearly contradict the video footage of the parties' encounter.[2] *See, e.g., Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 343 (6th Cir. 2016) (noting that "the video does not clearly show that [the suspect] 'targeted' [the officer] when he accelerated the vehicle and attempted to flee").

At the beginning of the relevant video footage, the officers are following plaintiffs' vehicle, discussing between themselves the vehicle's make and model. (Doc. No. 29 (Video) at 11:18-33.) One officer is heard speaking with dispatch and requesting a search of the vehicle's license plate number. (*Id*. at 11:34-38.) Noting that the license plate is not lit, one of the officers

---

[2] It should be noted that much of the altercation between Edward and the officers takes place away from the video camera, and the video is not entirely clear on all respects that are depicted on camera. In fact, the video is unclear enough to support certain aspects of each side's account of the events.

indicates that the temporary tag on the vehicle has expired. (*Id*. at 11:43-12:00.) At this point, the police cruiser's siren is audible and its lights are visible, and plaintiffs' vehicle comes to a complete stop in front of the cruiser. (*Id*. at 12:02-08.) One of the officers uses the public address speaker system to instruct Edward to pull over into the right-hand lane. (*Id*. 12:14 & 18.) While Edward initially puts on his blinker to indicate a right hand turn, he ultimately puts on his left blinker and turns left onto a side street where he immediately comes to a complete stop. (*Id*. 12:19-12:34.)

The officers exit their cruiser. Officer Lesser approaches the driver's side and begins saying something inaudible to Edward, while Officer Schismenos commences a conversation with Theresa. (*Id*. at 12:42-51.) While one of the officers asks Edward to turn off the vehicle, Theresa advises that she has a sick child and that she and Edward are *en route* to the hospital. (*Id*. at 13:00-09.) Officer Schismenos then attempts to gather more information about Edmund. Though he notes that Edmund "doesn't appear to have any problems," Officer Schismenos agrees to call an ambulance, "just to be sure." (*Id*. at 14:00-02.) Subsequently, Officer Schismenos is heard speaking on his radio and requesting emergency medical assistance for Edmund.

While the conversation between Officer Schismenos and Theresa is developing on the passenger side of the vehicle, Officer Lesser appears to be having difficulty extracting information from Edward. He tells Edward that he does "not know what is going on inside the car until [he] find[s] out." (*Id*. at 13:16-19.) He explains he pulled the vehicle over because the license plate had expired and the light above the license plate is out. He further notes that Edward does not have his driver's license on his person, and advises him that the failure to have

a driver's license in the car is an "arrestable offense." (*Id*. at 13:30.) Officer Lesser emphasizes that Edward does not "hear what he is saying," and ultimately notes that Edward is being "totally uncooperative." (*Id*. at 14:39.) His partner, Schismenos, suggests to Officer Lesser that he take Edward out of the vehicle. (*Id*. at 14:40.) Officer Lesser opens the door and instructs Edward to step out of the vehicle. Edward's hand is seen from inside the vehicle slamming the car door shut. (*Id*. at 14:52-53.) When Officer Lesser tells Edward through the shut door that he "will not tell him again" to exit the vehicle, Edward is heard to say "What's the problem, man?" (*Id*. at 14:58.)

Officer Schismenos comes to the driver's side door and opens it, shining his flashlight on Edward. One of the officers tells Edward that he "is going to be sorry" if he does not immediately step out of the vehicle. Still arguing with the officers, Edward exits the vehicle and is instructed to place his hands on the roof of the car. He places one hand on the roof, but keeps his other hand free as he continues to complain. When the officers attempt to place his hands in cuffs, Edward is heard to say "Hit my ass" with mace, and he begins to resist efforts to place the handcuffs on him.[3] (*Id*. at 15:08.) He yells at the officers that his son is in the car and that he is not going "fuck" anywhere with them. (*Id*. at 15:15.)

The officers wrestle Edward to the ground, and only part of each participant remains in view on the video over the next several minutes as the scuffle continues. Williams is eventually seen standing back up in full view of the camera, as Officer Lesser administers several abdominal strikes, first with his hands and later with a baton, and the strikes are accompanied by

---

[3] The Use of Force Report reflects that Edward was eventually subjected to a burst of mace. (Doc. No. 28-4 (Use of Force/Resisting Arrest Report, dated Oct. 2, 1996) ["Use of Force Report"]).) This is the only reference in the record to the grand jury/criminal trial evidence.

commands for Edward to fall to the ground. (*Id.*, beginning at 16:04.) The strikes appear to have little effect on Edward, who continues to kick the officers. The officers repeat the instruction to Edward to drop to the ground, and, while at one point he indicates that he will, he continues to resist the baton strikes. Throughout the encounter, Theresa is heard screaming—first while she is still inside the car and later after she exited the vehicle.

Ultimately, Edward and the officers return to the ground and out of view of the video. While the participants continue to yell, police sirens can also be heard and several uniformed police officers and an EMS worker are seen joining the fray. A voice is heard instructing Edward to "put your fucking arm behind your back." (Video at 17:32.) Six minutes after the scuffle began, a voice asks if "you got it?" and several officers disperse. As the EMS workers check on the vehicle's remaining occupants, Edward can still be heard screaming from the ground. One of the officers states that Edward and Theresa were lying about the child's asthma symptoms but that EMS was contacted in any event to "cover" the officers.[4] (*Id.* at 21:55-22:00.)

Officers Lesser and Schismenos arrested Edward and charged him with the following: failure to display a license, in violation of Ohio Rev. Code § 4507.35; assault, in violation of Ohio Rev. Code § 29013.13; resisting arrest, a violation of Ohio Rev. Code § 2921.33; obstructing official business, in violation of Ohio Rev. Code § 2921.31; and disorderly conduct, a violation of Ohio Rev. Code § 2917.11. Edward was also cited for a license plate violation, improper use of former plates, and display of a faulty tail light. (Doc. No. 28-2 (Affidavit of Jesse Lesser ["Lesser Aff."]) ¶ 5.) Officers Schismenos and Lesser also signed a Use of Force

---

[4] Notwithstanding this observation, medical records reflect that Theresa and her mother later that evening took Edmund to Akron Children's Hospital where he was treated for an acute reactive airway and asthma. (T. Williams Aff. ¶¶ 19-21; Doc. No. 63-1 (Medical Records).)

Report, following the incident. (Doc. No. 28-4 (Use of Force/Resisting Arrest Report, dated Oct. 2, 1996) ["Use of Force Report"]).)

On November 18, 1996, a Summit County Grand Jury returned an indictment against Edward on one count of resisting arrest and one count of assault. (Lesser Aff. ¶ 6; Doc. No. 28-5 (Grand Jury Indictment).) After a four-day jury trial ending April 28, 1997, Edward was convicted of these charges. (Lesser Aff. ¶ 9; Doc. No. 30-1 (Journal Entry).) While it is undisputed that the video was not introduced at trial, it is unclear whether the prosecutor was aware of the video before or during the jury trial. In fact, the record before this Court is largely silent as to what evidence or witnesses the prosecutor presented first to the grand jury and eventually to the petit jury.[5]

What is clear is that it was not until sometime around May of 2013 that Edward first saw the video of the arrest taken by Officer Schismenos, though the parties do not elaborate on the circumstances surrounding plaintiffs' discovery of the video. (E. Williams Dep. at 146.) On December 23, 2014, Edward moved the state common pleas court for a new trial based upon this recently discovered evidence. (Doc. No. 28-7 (Motion for New Trial).) On May 7, 2015, the common pleas court dismissed the criminal case against Edward without prejudice. (Doc. No. 28-9 (Journal Entry).)

The present action followed when, on October 19, 2015, plaintiffs filed suit in the Summit County Court of Common Pleas. (Doc. No. 1-1 (Complaint ["Compl."]).) On November

---

[5] In his affidavit, Officer Lesser avers that he testified at Edward's criminal trial, and that his testimony was consistent with his account of the encounter set forth in the Use of Force Report. (Lesser Aff. ¶ 9.)

16, 2015, Akron defendants removed the action to federal court. (Doc. No. 1 (Notice of Removal).) In addition to a request for compensatory and punitive damages, the complaint contains nine substantive claims: excessive force, false imprisonment/arrest, malicious prosecution, willful and reckless conduct (federal law), willful and reckless conduct (state law), intentional infliction of emotion distress, withholding exculpatory evidence, municipal liability, and loss of consortium. The first, second, and seventh claims are brought under federal and state law.

## II. Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991) (citation omitted). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the

duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### III. DISCUSSION

#### A. **Statute of Limitations**

Defendants insist that plaintiffs' first claim—excessive force under 42 U.S.C. § 1983—is time-barred. "Because Congress did not specifically adopt a statute of limitations governing § 1983 actions, 'federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought.'" *Drake v. City of Detroit, Mich.*, 266 F. App'x 444, 448 (6th Cir. 2008) (quoting *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (further citation omitted)). In Ohio, the statute of limitations for § 1983 actions is contained in Ohio Rev. Code § 2305.10, which requires that actions for bodily injury be filed within two years after their accrual. *Browning v. Pendleton,* 869 F.2d 989, 992 (6th Cir. 1989).

The question of *when* the statute of limitations begins to run, however, is governed by federal law. *Ruff v. Runyon,* 258 F.3d 498, 500 (6th Cir. 2001) (citing *Wilson v. Garcia,* 471 U.S. 261, 268–71, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)). "The 'standard rule' is that a cause of action accrues 'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (quoting *Wallace v. Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007) (further quotation marks, citations, and alterations omitted)). The Sixth Circuit has held that, "when asserting a claim under § 1983 for the use of excessive force, the 'injury' occurs on the date of the constitutional injury, the date the allegedly excessive force is used." *Hodge v. City of*

*Elyria,* 126 F. App'x 222, 224 (6th Cir. 2005) (citing *Washington v. Summerville,* 127 F.3d 552, 556 (7th Cir. 1997)); *Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007) ("A § 1983 claim for excessive force in effectuating an arrest accrues at the time of arrest.") (citation omitted). Here, plaintiffs' excessive force claim accrued on October 2, 1996, the date of Edward's arrest. On that date, plaintiffs had all the facts they needed to prosecute this claim, as the events surrounding defendant officers' use of force in effectuating Edward's arrest would "have alerted the typical lay person to protect his or her rights." *D'Ambrosio*, 747 F.3d at 384 (quotation marks and citation omitted).

Accordingly, the Court finds that plaintiffs' first claim for relief—excessive force under § 1988—is time-barred. Further, to the extent that plaintiffs' false imprisonment, willful conduct, and intentional infliction of emotional distress claims are grounded in the officers' use of force during the arrest, these claims are also untimely. *See Doe v. First United Methodist Church*, 629 N.E.2d 402, 407 (Ohio 1994) (when a claim for intentional infliction of emotional distress arises directly from another tort, the statute of limitations for that other cause of action applies). Of course, even if the two-year statute of limitations period for personal injury actions did not apply, the intentional infliction of emotional distress claim would still be barred by the four-year statute of limitations under Ohio Rev. Code § 2305.09. *See Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 672 (Ohio 1983) (four-year statute of limitations applicable for Ohio claims of intentional infliction of emotional distress).

Plaintiffs seem to concede defendants' timeliness argument, noting that:

[t]he case law appears to support [defendants' position that the excessive force claim is untimely] given that there does not seem to be any tolling of the accrual during the period of time that evidence of excessive force and false imprisonment were withheld from [Edward]. Unlike many cases alleging excessive force or

> false imprisonment, the conduct allegedly underlying the conviction was
> intrinsically intertwined with [Edward's] ability to bring a claim for excessive
> force and false imprisonment. The inability to vacate that conviction and obtain
> the recording of the incident demonstrating these claims was prejudicial to
> [Edward] and now precludes him from pursuing otherwise valid claims.

(Opp'n Akron MSJ at 828; Opp'n Schismenos MSJ at 862-63.) Notwithstanding plaintiffs'

qualified concession, and even those these claims are time barred, because plaintiffs advance

arguments that the officers are not entitled to judgment on these claims, the Court will consider

these claims on the merits.

B. **Qualified Immunity Analysis**

The defendant officers maintain that qualified immunity protects them from liability for

all federal claims asserted against them in their individual capacities. The qualified immunity

doctrine shields government officials performing discretionary actions from civil damages

liability if their actions did not violate clearly established statutory or constitutional rights of

which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.

Ct. 808, 172 L. Ed. 2d 565 (2009) (quotation marks and citation omitted). "Qualified immunity

provides police officers 'breathing room to make reasonable but mistaken judgments and

protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v.

Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, -- U.S. --, 134 S. Ct. 3, 5,

187 L. Ed. 2d 341 (2013)). Qualified immunity will apply "'if officers of reasonable competence

could disagree on the issue.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092,

89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)

(qualified immunity will apply unless it is obvious that no reasonably competent official would

have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first.[6] *See Pearson*, 555 U.S. at 236.

The Supreme Court has recently reiterated earlier admonitions that "'clearly established law'" should not be defined 'at a high level of generality.'" *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case."[7] *Id*. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule of

---

[6] On some occasions, it may be necessary to employ a third step, which is whether the plaintiff "'offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 468 (6th Cir. 2006) (quoting *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 901 (6th Cir. 2004)).

[7] Because of the factually particularized nature of the qualified immunity analysis, "'[e]ach defendant's liability must be assessed individually based on his own actions.'" *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). "To hold an officer liable for the use of force, a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id*. (quoting *Binay*, 601 F.3d at 650).

qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 563 U.S. at 639).

According to this directive, "a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, -- F. App'x --, 2017 WL 729730, at *3 (6th Cir. Feb. 24, 2017) (quoting *Pauly*, 137 S. Ct. at 552). Throughout the qualified immunity analysis, "[t]he 'dispositive inquiry . . . [remains] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).

*Excessive Force*

It is axiomatic that a citizen has a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Moreover, citizens have a constitutional right to be free from police force when they are fully compliant and not resisting reasonable police action. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). Excessive force cases are analyzed under an "objective reasonableness" standard. *Id.* at 388. Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tenn. v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (quotation marks and citation omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

"This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. 396-97. Ultimately, a plaintiff bears the burden of demonstrating that any force used was unjustified in order to establish a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989) (citations omitted).

<u>Officer Lesser</u>

Because Officer Lesser administered the hand and baton strikes and was most directly involved in the use of force, the Court begins its individualized inquiry with him. The first question the Court must answer as to this defendant is whether, under the totality of the circumstances, it was objectively reasonable for Lesser to use force against Edward. The Court finds that it was. The video clearly shows that Edward was uncooperative and confrontational when he slammed the car door shut after he was given an order to step out of the vehicle.[8] It

---

[8] Edward also admitted that he failed to answer Officer Lesser's' initial questions regarding his address because he was speaking with his wife and he "took a deep breath to try and figure out why [the officer] was hollering" at him. (E. Williams Dep. at 74.)

further shows that Edward argued with the officers and failed to place both hands on the vehicle's hood as he was instructed to do. Moreover, Edward can be seen resisting efforts to place him in handcuffs.[9] Given the size disparity between Edward and the officers, as conceded by Edward and seen on the video, it was reasonable for Officer Lesser to employ force to effect the arrest of a much larger and resisting suspect.[10]

Critically, the hand and baton strikes were in response to Edward's defiant actions, and were accompanied by instructions to stop resisting and "go to the ground." Further, the strikes were applied to the lower region of Edward's body, and were not so forceful as to seriously injury Edward as they appeared to have little effect on him. *See, e.g., Frodge v. City of Newport*, 501 F. App'x 519, 531 (6th Cir. 2012) (finding officer's baton strikes objectively reasonable where they were designed to control resisting suspect).

Plaintiffs argue that the video actually demonstrates that Edward was compliant and cooperative. While they concede that Edward did not initially turn his vehicle right as directed, they explain that Edward was "looking for a place to pull over, other than the middle of West Market Street and other than attempting to turn right across a lane of east bound traffic that he was unable to see as the cruiser was directly behind him blocking his vision[.]"(Opp'n Akron MSJ at 823.) Of course, Edward's privately-held intent is irrelevant to the constitutional analysis because the Court must focus on the totality of facts known to the officers at the time of the

---

[9] Akron defendants insist that Edward conceded in his deposition that he refused to go to the ground. (Akron MSJ at 146, citing E. Williams Dep. at 94.) However, a careful review of his deposition testimony reveals that Edward indicated that he attempted to drop to the ground but could not because he was afraid of being hit in the head, and that, in any event, the antenna from one of the officers' radios was positioned in such a way that he could not drop to the ground. (E. Williams Dep. at 94-96.) Because the video does not clearly refute this testimony, the Court does not reject it on summary judgment.

[10] A former football player, Edward testified that, at the time of the incident, he weighed approximately 250 pounds, making him considerably larger and heavier than the arresting officers. (E. Williams Dep. at 90.)

encounter. *See Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996) (courts must consider "only the facts the officers knew at the time of the alleged Fourth Amendment violation") (citing *Anderson*, 483 U.S. at 641). Still, the Court agrees that a reasonable juror could believe that this initial decision was neither uncooperative nor obstructionist but represented an attempt to find a safe place to pull over, as Edward had already come to a complete stop when he saw the police lights, initially signaled right, but then slowly turned left onto the nearest side street. Yet, it was the undisputed actions after the stop—refusing to answer routine questions, arguing with the officers, slamming the car door, and disregarding orders to place his hands on the hood of the car and submit to handcuffing—that would have led the reasonable officer to believe that Edward was actively resisting arrest. *See, e.g., Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 97 (6th Cir. 2002) (suspect was actively resisting arrest because he refused to move his arms from underneath his body so as to facilitate handcuffing).[11]

Plaintiffs further argue that the video shows that it was "physically impossible" for Edward to go down to the ground while Officer Lesser was beating him with the baton and Officer Schismenos was holding him from behind. According to plaintiffs, Edward made every effort to comply with the officers' instructions. (Opp'n Schismenos MSJ at 866.) Of course, this

---

[11] It is true that the Sixth Circuit has observed that non-compliance alone is not enough to constitute active resistance—"there must be something more." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). In *Eldridge*, the court noted that additional affirmative acts, such as a deliberate act of defiance or a verbal showing of hostility, are necessary to show resistance warranting the use of force. *Id.* In *Caie*, for instance, the suspect advised the officers that he would fight them. 485 F. App'x at 96. Here, Edward defiantly slammed the car door and yelled at the officers, informing them that he was not going anywhere with them. Regardless of his subjective reasons for these objective actions, the officers were entitled to view his actions as active resistance.

argument gains no traction given the fact that once he was on the ground, Edward is seen on the video standing up again and continuing to resist efforts to restrain him. What was known to Officer Lesser at the time was that Edward continued to resist efforts to subdue him. Still, plaintiffs insist that "at the very least, there are multiple reasonable determinations possible." (Opp'n Akron MSJ at 830.) And that fact is fatal to plaintiffs' excessive force claim. If Edward's actions are subject to different reasonable interpretations, then reasonable officers could disagree as to the criminal nature of Edward's actions, and qualified immunity is proper.[12]

According to the facts known to the officers at the scene, each of the *Graham* factors weigh in favor of affording Officer Lesser qualified immunity for his use of force. Resisting arrest is a serious crime and, by actively resisting, Edward placed everyone at the scene of the traffic stop at risk. Given the quickly evolving nature of the circumstances surrounding the stop, the Court finds that Officer Lesser's actions were objectively reasonable.

Officer Schismenos

This analysis applies equally to Officer Schismenos' use of force in attempting to restrain Edward and effect his arrest. Plaintiffs have failed to identify any genuine issues of material fact that the use of force applied by Officer Schismenos was objectively unreasonable, and this defendant is also entitled to qualified immunity.[13]

This is not to say that the officers' collective interaction with the Williams family on

---

[12] Even if Officer Lesser was mistaken as to Edward's ability to comply with his request to "go to the ground," he would still be entitled to qualified immunity because the qualified immunity inquiry is broad enough to support such "reasonable but mistaken judgments[.]" *Mullins*, 805 F.3d at 765. Plaintiffs have failed to come forward with any evidence that could demonstrate that Lesser was plainly incompetent or that he deliberately violated Edward's constitutional rights. *Id.*; *see Chappell*, 585 F.3d at 907.

[13] Plaintiffs have moved to strike the expert report of defendant Schismenos, Gary Rini. (Doc. No. 62.) Defendant Schismenos opposes the motion (Doc. No. 66), and plaintiffs have filed a reply. (Doc. No. 67.) Because the Court did not rely on the expert's report in resolving the dispositive motions, plaintiffs' motion to strike is denied as moot.

October 2, 1996 should serve as a model for how the police should engage with the public. Had the officers approached the vehicle with a little more professionalism, and a little less bravado, the rest of the stop may have gone differently. The video shows that Officer Lesser was unnecessarily confrontational with Edward from the onset of the stop, and Officer Schismenos' callous attitude toward the couple's son's medical condition was unsettling. The use of force, however, did not violate Edward's constitutional rights. "While the Fourth Amendment provides restrictions on the interactions between law enforcement and citizens, it does not constitutionally require polite behavior or a steady demeanor by the police officer." *DeRosa v. Rambosk*, 732 F. Supp. 2d 1285, 1294 (M.D. Fla. 2010); *see, e.g., Smith v. Tolley*, 960 F. Supp. 977, 997 (E.D. Va. 1997) (qualified immunity protected police officer from liability under § 1983, despite the fact that the officer was ultimately disciplined for violating county policies regarding professional attitude toward suspects).

*False Imprisonment/Arrest*

Plaintiffs' second claim for relief provides that "Defendants Schismenos and Lesser arrested, detained, and imprisoned [Edward] maliciously and in bad faith." (Compl. ¶ 38.) Assuming, arguendo, that this claim is not time-barred, plaintiffs' false imprisonment/arrest claim fails on the merits. A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). "Probable cause to arrest someone exists if 'the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.'" *Atkins v. Twp. of Flint*, 94 F. App'x 342, 347 (6th Cir. 2004) (quoting

*Diamond v. Howd*, 288 F.3d 932, 936-37 (6th Cir. 2002) (further quotation marks and citation omitted)). A defendant officer only needs to demonstrate probable cause to arrest a plaintiff on one of the charges to defeat a false arrest claim under § 1983. *See id.* at 348.

At the time of his arrest, the defendant officers had probable cause to believe that Edward had violated Ohio Rev. Code § 4507.35. That statute makes it unlawful to fail to display a valid driver's license upon request by a police officer. Ohio Rev. Code § 4507.35(a) & (b). While the existence of probable cause is typically a jury question, where there is only one reasonable determination possible, such a claim may be resolved on summary judgment. *Atkins*, 94 F. App'x at 347 (quotation marks and citation omitted). Here, Edward concedes that he did not have his license with him that evening, and was unable to produce it upon the request. Because the officers had probable cause to arrest him for failure to display a valid driver's license, plaintiffs cannot maintain a § 1983 action for false arrest.

*Malicious Prosecution*

"The Sixth Circuit recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes*, 625 F.3d at 308 (quotation marks and citation omitted). "A malicious-prosecution claim under § 1983 has four elements: first, that the defendant 'made, influenced, or participated' in the decision to prosecute the plaintiff; second, that the prosecution lacked probable cause; third, that the criminal proceeding caused a deprivation of the plaintiff's liberty apart from the initial seizure; and fourth, that the criminal proceeding resolved in the plaintiff's favor." *Martin v. Mauer*, 581 F. App'x 509, 511 (6th Cir.

2014) citing *Sykes*, 625 F.3d at 308-09).[14]

Focusing on the probable cause prong, defendants offer the same argument they raised in opposition to plaintiffs' false arrest claim. According to defendants, it is enough that the record conclusively demonstrates that the defendant officers had probable cause to arrest Edward for failure to display a valid license. Because "[t]here was probable cause to believe that [Edward] committed at least some of the offenses for which he was charged[,]" defendants maintain that plaintiffs' malicious prosecution claim fails. (Akron MSJ at 151.)

In support of this argument, Akron defendants cite the Third Circuit's decision in *Wright v. City of Phila.*, 409 F.3d 595 (3d Cir. 2005). There, the court held that a reasonable belief that a suspect had committed any of the charged offenses entitled the arresting officers to qualified immunity in a subsequent malicious prosecution action under § 1983. *Id.* at 602. While the Sixth Circuit has yet to address the issue, the Court's research reflects that *Wright* represents the minority view, and that most courts have required probable cause for each crime charged to defeat a malicious prosecution claim. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 689 (7th Cir. 2007) (probable cause as to only one offense charged is not a bar to a civil action for malicious prosecution) (collecting cases); *Mazzetti v. Bellino*, 57 F. Supp. 3d 1262, 1268 (E.D. Cal. 2014) ("That probable cause existed, or a conviction may have resulted, as to some charges does not preclude a plaintiff from pursuing a claim [for malicious prosecution] based on those

---

[14]Though it appears that plaintiffs bring their malicious prosecution claim exclusively under federal law, the elements are similar under Ohio law, and the analysis would be the same. *See Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 735 (Ohio 1990) (recognizing three elements: (1) malice in instituting or continuing prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the criminal defendant) (quotation marks and citation omitted).

charges to which no probable cause existed and to which there was a favorable termination.") (citations omitted); *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) ("As with false arrest claims, the existence of probable cause is a complete defense to a claim of malicious prosecution in New York, but unlike false arrest claims, the defendant must have possessed probable cause as to each offense charged.") (quotation marks and citations omitted); *Beiles v. City of Chicago*, 987 F. Supp. 2d 830, 838 (N.D. Ill. 2013) (similar); *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 639 (D. N.J. 2011) (collecting cases). District courts within the Sixth Circuit have adopted the majority view. *See, e.g., Martin v. Coyt*, No. 1:10-cv-176, 2013 WL 1187940, at \*3-4 (W.D. Ky. Mar. 21, 2013) (In malicious prosecution claim under Kentucky law, rejecting *Wright* and holding that only a lack of probable cause as to all charged offenses will defeat a malicious prosecution claim); *see also Mott v. Mayer*, 524 F. App'x 179, 186 (6th Cir. 2013) (noting that "[t]he tort of malicious prosecution is entirely distinct from that of false arrest, as the malicious-prosecution tort remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process") (quotation marks and citations omitted, emphasis in original).

The Court need not weigh in on this issue because plaintiffs' malicious prosecution claim still fails to clear the probable cause prong inasmuch as Edward was indicted on the underlying offenses pursuant to a determination made by a grand jury. "[I]t has long been settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.'" *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) (quoting *Ex parte United States*, 287 U.S. 241, 250, 53 S. Ct. 129, 77 L. Ed. 2d 283 (1932)). The presence of an indictment returned

by a properly constituted grand jury is fatal to plaintiffs' malicious prosecution claim.

Plaintiffs argue, however, that the presumption flowing from a grand jury indictment may be rebutted by evidence that a police officer knowingly offered false testimony before the grand jury.[15] (Opp'n Schismenos MSJ at 867). *See Mott*, 524 F. App'x at 187 ("an exception applies 'where the indictment was obtained wrongfully by defendant police officers who knowingly present[ed] false testimony to the grand jury'") (quoting *Cook v. McPherson*, 273 F. App'x 421, 424 (6th Cir. 2008) (further citation omitted)); *see Webb v. United States*, 789 F.3d 647, 661 (6th Cir. 2015) (recognizing an exception to the general rule in *Higgason* for a grand jury indictment based on false testimony); *see also Sykes*, 625 F.3d at 312 ("It is well established in this circuit that [p]olice officers cannot, in good faith, rely on a judicial determination of probable cause [to absolve them of liability] when that determination was premised on an officer's own material misrepresentations to the court.") (quotation marks and citation omitted). Under this exception, a previously indicted defendant can overcome the presumption by establishing: "'(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of

---

[15] A recent Sixth Circuit decision has called into question the continued viability of this exception to the presumption that accompanies a grand jury indictment. In *Sanders v. Jones*, 845 F.3d 721, 730-31 (6th Cir. 2017), the court addressed the tension between the Sixth Circuit exception for false grand jury testimony and the Supreme Court's ruling in *Rehberg v. Paulk*, 566 U.S. 356, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012) that a witness's grand jury testimony is entitled to absolute immunity. The court in *Sanders* recognized that "Sixth Circuit precedent indicates that a plaintiff who was indicted by a grand jury can overcome the presumption of probable cause only by evidence that the defendant made false statements to the grand jury. *False statements made in a police report or to a prosecutor do not satisfy this test*." *Id*. at 732 (emphasis added). Yet, the court also observed that, under *Rehberg*, a police officer enjoys absolute immunity for his grand jury testimony. Accordingly, the court held that the ruling in *Rehberg* effectively eliminated the exception to the grand jury presumption because a plaintiff cannot rely on either police reports or grand jury testimony. *Id.* at 733. Akron defendants asserted absolute immunity as an affirmative defense, but since the motions were filed before the ruling in *Sanders*, and the parties did not address absolute immunity, the Court does not base its decision on this recent ruling. *Id*. at 733-34 (distinguishing prior Sixth Circuit cases recognizing the exception by noting that the issue of absolute immunity was not before the court in those cases).

probable cause.'" *Sanders v. Jones*, 845 F.3d 721, 729 (6th Cir. 2017) (applying false arrest standard applicable where officer had a judicially-secured warrant to malicious prosecution exception) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003)).

Plaintiffs concede that it is no longer possible to obtain the grand jury transcripts from the 1996 incident because the Summit County Court of Common Pleas only keeps records of criminal proceedings for ten years. (Opp'n Schismenos MSJ at 867-8, citing Doc. No. 61-3 (Affidavit of Chief Court Reporter Terri Sims).) Nevertheless, plaintiffs argue that they need not produce the grand jury transcripts because they have the officers' police reports and it should be presumed that they testified in a manner that was consistent with those reports.[16]

According to plaintiffs, the recently discovered video directly contradicts the officers' Use of Force Report and demonstrates that the officers knowingly offered false testimony. Plaintiffs highlight the fact that Officer Schismenos indicated in his report that Edward's hands were "clenched" and he assumed an "offensive posture" when he finally exited the car. (Opp'n Schismenos MSJ at 856, citing Use of Force Report at 295.) The Court disagrees that the video clearly refutes this statement. Edward's left hand is only visible for a moment, and while it is not tightly balled in a fist, it does not appear to be open in a manner consistent with surrender. Moreover, the video clearly shows that Edward was arguing with and resisting the officers, lending support to the representation that he had assumed an offensive posture. Plaintiffs also attempt to refute the report by offering explanations for why Edward took some of the actions he took. (*Id.* at 869 and referencing earlier arguments). Edward's explanations for his actions do not

---

[16] It should be noted that the Court has before it no information that would establish that either officer testified before the grand jury. While Officer Lesser has averred that he testified at Edward's criminal trial, nothing in the record sheds any light on the evidence presented to the grand jury. For this reason alone, plaintiffs have not demonstrated that the exception is applicable.

change what the officers saw and what they reported in their Use of Force Report. This attempt to pick apart the police report falls woefully short of a "substantial showing" that the officers stated a deliberate falsehood or showed a reckless disregard for the truth necessary to satisfy the first prong of the test.

Defendants are entitled to the presumption of probable cause that comes from a grand jury indictment. They are, accordingly, also entitled to summary judgment on plaintiffs' malicious prosecution claim.

### Federal Willful Conduct and Withholding Evidence

In their seventh claim for relief, plaintiffs allege that defendants "failed to disclose exculpatory evidence in the form of the video to [Edward] prior to or during his trial. The concealed exculpatory evidence was material, and the failure to turn over the evidence gave rise to constitutional violations of [Edward's] rights under *Brady v. Maryland,* 42 U.S.C. § 1983 and the United States and Ohio Constitutions." (Compl. ¶ 63.) Plaintiffs suggest that their fourth claim, willful conduct, is based on the same withholding of evidence and implicates Edward's "liberty interest in fair criminal proceedings." (Opp'n Akron MSJ at 832.) Both claims, therefore, turn on the exculpatory value of the video.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that due process requires the prosecution to disclose upon request evidence favorable to an accused when such evidence is material to guilt or punishment. A prosecutor violates its duties under *Brady* when evidence that is favorable to the accused because it is exculpatory or impeaching is suppressed, either willfully or inadvertently, and prejudice ensues. *Strickler v. Green*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (citation

omitted). Police officers share an analogous duty to disclose exculpatory evidence. *See Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009). Unlike prosecutors, who must disclose exculpatory evidence directly to the defense, police officers "fulfill their *Brady* obligations as long as they inform the prosecutor about the evidence that undermine[s] the state's preferred theory of the crime." *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quotation marks and citation omitted).

There is nothing in the record to suggest what, if any, conversations the defendant officers and the prosecutor had regarding Edward's case.[17] Still, assuming that the officers did not mention the existence of the video, such an omission would not have violated their *Brady*-derivative duty because the video does not undermine the state's preferred theory that Edward resisted arrest and assaulted a police officer in the course of the traffic stop on October 2, 1996. As previously discussed, the video confirms that Edward actively resisted the officers' efforts to arrest him, and, while much of the actual scuffle between Edward and the officers takes place outside of the view of the video camera, there is nothing about the remaining footage that would dispel the notion that Edward assaulted one or more officers before he was finally wrestled to the ground. More to the point, there is nothing about the video footage that, had it been seen by the jury, would have changed the outcome of Edward's criminal trial as it clearly demonstrates that Edward resisted arrest. *See Sykes*, 625 F.3d at 320 (noting that a "*Brady* violation will not result in a grant of relief unless we can conclude that the evidence the police improperly withheld could reasonably be taken to put the whole case in a different light as to undermine confidence in the

---

[17] The fact that the video was not played at trial, by itself does not establish that the prosecutor was never advised about the video. It is possible that the prosecutor knew and simply chose not to introduce it at trial. As such, a reasonable jury cannot find that the officers failed to meet their *Brady* responsibilities. *See, e.g., Carter v. City of Detroit*, No. 16-1219, 2017 WL 395977 (6th Cir. 2017) (affirming summary judgment under similar facts).

verdict.") (quotation marks and citations omitted).

Because plaintiffs can point to no facts that, if believed, would support their fourth and seventh claims for relief, the defendant officers are entitled to summary judgment on them.[18]

*Monell Liability*

Plaintiff seeks to hold the City of Akron liable under a theory that the policy and customs implemented by it resulted in a deprivation of Edward's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). However, "the constitutional violation of a municipal official is a prerequisite to municipal liability." *Pollard*, 780 F.3d at 404 (citing *Weeks v. Portage Cnty. Exec. Offices*, 235 F.3d 275, 279 (6th Cir. 2000)). Because the Court has determined that Edward's constitutional rights were not violated by the actions taken against him by the individual defendant officers, the City of Akron is entitled to summary judgment on plaintiffs' claim of municipal liability. *See, e.g., Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014); *Pollard*, 780 F.3d at 404; *see also Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").

Even if plaintiffs had established the existence of questions of material fact regarding the

---

[18] Plaintiffs' substantive due process claim (Fourth Claim for Relief) would be subject to dismissal for the additional reason that such a general claim is subsumed by the more specific constitutional protections implicated in plaintiffs' *Brady* claim. *See Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (explaining that when a particular amendment provides an explicit textual source of constitutional protection against a particular type of governmental behavior, "that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing such a claim"); *Warren v. City of Athens*, 411 F.3d 697, 706-07 (6th Cir. 2005) (dismissing substantive due process claim where Fifth Amendment Taking Clause was available) (citations omitted).

deprivation of any constitutional rights, defendants would still be entitled to summary judgment on the *Monell* claim because plaintiffs have not identified facts that, if believed, would establish that the officers' actions were pursuant to an official municipal policy. Because a municipality cannot be held vicariously liable for the actions of its employees, it can only be held liable under § 1983 for action taken pursuant to the municipality's "official policy." *Monell*, 436 U.S. at 692. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *D'Ambrosio*, 747 F.3d at 386 (quoting *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011)). "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

Akron defendants insist that, at the time of the incident, Officers Schismenos and Lesser "were not policymakers for the City of Akron, as a matter of law. Rather, Schismenos and Lesser were merely uniformed Patrol Officers in the Police Division of the City of Akron Department of Public Safety." (Akron MSJ at 157.) In support, they direct the Court to the city's charter. Section 54 of the Akron City Charter provides, "The Mayor shall be recognized as the official head of the City by the courts." (*Id*. at 157-58, quoting Akron City Charter.) The city charter further states that the mayor's "powers and duties shall be . . . [t]o exercise control over all departments and divisions created by the Charter or that may be hereafter created by the

Council." (*Id.* at 158, quoting Akron City Charter.) Defendants argue that the city charter makes clear that the "final authority to establish municipal policy remained with the mayor, or his designee[,]" and not with Officers Schismenos and Lesser. (*Id.*)

Plaintiffs respond by noting that, in certain circumstances, even individual police officers can be considered policymakers for purposes of *Monell*, and cite two cases as authority. Both cases are easily distinguished. In *Monistere v. City of Memphis*, 115 F. App'x 845 (6th Cir. 2004), two police officers brought suit against the city, alleging that a strip search of the officers in connection with an internal, administrative investigation into a motorist's complaint that the officers had stolen from him during a traffic stop violated their constitutional rights. The Sixth Circuit found that the detective conducting the administrative investigation was a final policymaker, for purposes of *Monell* liability, because he had been vested with complete discretion to conduct the investigation in any manner he saw fit. Notwithstanding the existence of a city code reserving policymaking for the Director of Police Services, the court found that the detective enjoyed "the requisite policymaking authority inasmuch as he had been delegated with the authority to control his own investigations." *Id.* at 852. In reaching this conclusion, the court stressed that it is not confined to looking at formal codes and ordinances, but may also consult "less formal sources of law, such as local practice and custom." *Id.* (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)).

Similarly, in *Kammeyer v. City of Sharonville*, No. 1:01-CV-649, 2006 WL 1133241 (S.D. Ohio Apr. 27, 2006), the police chief was the designated policymaker, and he delegated the authority to the lead detective to act as the policymaker in the context of a particular case involving a murder investigation. In finding that the lead detective was a policymaker, the court

emphasized that the police chief delegated authority to the detective by allowing him "unfettered discretion in conducting murder investigations." *Id*. at *11.

Herein, Officers Lesser and Schismenos were uniform patrol officers, and there is nothing before the Court to suggest that they had been delegated any authority to make policy. Further, while the Court may look beyond the city charter, plaintiffs cite no less formal sources of law that would suggest that these officers were acting pursuant to a local practice or custom that was "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citations omitted). Because these officers were not policymakers, plaintiffs' *Monell* claim against the City of Akron fails for this additional reason.

### *State Law Claims and Tort Immunity*

Section 2744 of the Ohio Revised Code extends to municipalities immunity from tort liability for governmental and propriety functions. Ohio Rev. Code § 2744.02(A)(1); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). It is well settled that "government functions" include the operations of law enforcement. *See* § 2744.01(C)(2)(a); *Harris v. Sutton*, 918 N.E.2d 181, 185 (Ohio Ct. App. 2009). There are, however, certain exceptions to the general grant of immunity spelled out in the statute. Specifically, § 2744.02(B) provides five instances where immunity is not available to a municipality: (1) injury or damage is caused by a municipal employee's negligent operation of a motor vehicle; (2) the losses are due to the negligent performance of employees with respect to proprietary functions of a political subdivision; (3) damages are the result of a municipality's negligent failure to keep public roads in repair; (4) damages are the result of a physical defect on the grounds of public buildings used for

government functions; and (5) civil liability is expressly imposed by another provision of the Ohio Revised Code.

Based on the undisputed fact that the underlying incident involved an investigatory traffic stop, there can be no doubt that the City of Akron qualifies for immunity under Ohio Rev. Code § 2744.02(A)(1), as its employees were engaged in the governmental function of police activities. Further, none of the five exceptions applies to the circumstances as they are known following discovery. Thus, to the extent that the municipality is sued under state law, it is entitled to immunity for plaintiffs' state tort claims. *See generally Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 744 (N.D. Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity under § 2744.02 for the intentional torts committed by their employees.") (collecting cases).

Ohio Rev. Code § 2744 also provides immunity for tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id*. "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owned in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the

conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*.

Based on the same analysis presented above with respect to federal qualified immunity, the Court concludes that there are no genuine issues of material fact and that the individual defendants are entitled to immunity from liability in connection with plaintiffs' state law claims. In the same way in which plaintiffs failed to demonstrate that the officers' actions were objectively unreasonable, plaintiffs have also failed to show that the officers acted with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Chappell*, 585 F.3d at 916 n.3 (holding that failure to prove objective unreasonableness to avoid qualified immunity under 42 U.S.C. § 1983 also defeated claim for qualified immunity under Ohio law); *see Pollard*, 780 F.3d at 404 ("If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum"); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law.") (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).

**IV. CONCLUSION**

For all of the foregoing reasons, defendants' motions for summary judgment (Doc. Nos. 28, 30) are granted. This case is dismissed.

**IT IS SO ORDERED**.

Dated: June 28, 2017

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**